UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
UNITED STATES OF AMERICA

    v.                                    Hon. Jed S. Rakoff

MONZER AL KASSAR,
TAREQ MOUSA AL GHAZI, and          S3 07 Cr. 354 (JSR)
LUIS FELIPE MORENO GODOY

     Defendants
-------------------------------------------------------------------X

MEMORANDUM OF LAW OF DEFENDANT TAREQ MOUSA AL GHAZI IN
SUPPORT OF MOTION TO DISMISS THE INDICTMENT AND OTHER RELIEF

MARC AGNIFILO, ESQ.
*Attorney for Tareq Mousa al-Ghazi*
Brafman & Associates, P.C.
767 Third Avenue
New York, New York  10017
(212) 750-7800
Magnifilo@braflaw.com

# CONTENTS

(Page)

Introduction . . . . . . . . . 1

Factual Background . . . . . . . . 3

POINT ONE

THE PROSECUTION OF THESE NON-U.S.-CITIZENS
FOR CRIMES CREATED BY DEA OPERATIVES DURING
A "STING" OPERATION IN OTHER COUNTRIES AND
REGARDING PURPORTED OFFENSES TO OCCUR IN
COLOMBIA VIOLATES DEFENDANTS' RIGHTS TO DUE PROCESS
UNDER THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION . 8

1.    Defendants Al-Ghazi and Moreno Godoy Have The Right
      To Due Process Of Law Under the Fifth Amendment
      To The U.S. Constitution . . . . . 10

2.    The Government Was So Involved In the Creation Of The
      Charged U.S. Offenses As To Violate Defendants' Due
      Process Rights Under the Fifth Amendment To The
      U.S. Constitution . . . . . . 10

      A.    The Nature of the Government's Investigation . 10

      B.    Due Process And Over-Reaching Government
            Conduct . . . . . . . 14

3.    The Government Improperly Manufactured Federal
      Jurisdiction . . . . . . . 18

4.    Because Defendants Were Lured Into Committing A
      Crime Against The United States, An Insufficient Nexus
      Exists Between Them And The United States, Such That
      Prosecution Of Them Here Violates Their Fifth
      Amendment Due Process Rights . . . . 20

5.    Defendants Lacked Fair Warning That This Conduct
      Violated U.S. Law. . . . . . . 23

(Page)

POINT TWO

A PRE-TRIAL HEARING SHOULD BE ORDERED ON THE
DUE PROCESS CLAIM     .     .     .     .     .     .     .     23


POINT THREE

SURPLUSSAGE MUST BE REMOVED FROM THE INDICTMENT     .     24


POINT FOUR

ABILITY TO FILE ADDITIONAL, APPROPRIATE MOTIONS     .     .     25


CONCLUSION     .     .     .     .     .     .     .     .     25

TABLE OF AUTHORITIES

(Cases)                                                                      (Page(s))

Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985)         .        .        22

Hampton v. United States, 425 U.S. 484, 495 (1976)          .        .        15

Hanson v. Denckla, 357 U.S. 235 (1958)        .        .        .        .        22

Kinsella v. Unites States ex rel Singleton, 361 U.S. 234, 246 (1960)        16

Rocha v. United States, 288 F.2d 545 (9th Cir. 1961).        .        .        22

United States v. Archer, 486 F.2d. 670 (2d Cir 1973)        .        .        17,18

United States v. Arteaga, 807 F.2d 424, 426 (5th Cir. 1986) .        .        16

United States v. Baltres-Santolino, 521 F.Supp. 744 (N.D.Cal. 1981)        16

United States v. Bin Laden, 92 F.Supp. 2d 189 (S.D.N.Y. 2000)        .        9,12,21,23

United States v. Caicedo, 47 F.3d 370, 372 (9th Cir. 1995) .        .        12

United States v. Capo, 693 F.2d 1330, 1336 (11th Cir. 1983).        .        16

United States v. Cuervelo, 949 F.2d 559, 567 (2d Cir. 1991)        .        24

United States v. Davis, 905 F.2d 245, 248-249 (9th Cir. 1990)        20,21

United States v. Gardener, 658 F.Supp. 1573 (W.D. Pa. 1987)        .        16

United States v. Greene, 454 F.2d 783, 787 (9th Cir. 1971)  .        .        16

United States v. Jacobson, 916 F.2d 467, 469 (8th Cir. 1990)
(en banc), rev'd on other grounds, 503 U.S. 540 (1992)        .        .        16

United States v. Jannotti, 673 F.2d 578, 607 (3d Cir.) (en banc),
cert. denied, 475 U.S. 1106 (1982)        .        .        .        .        16

United States v. Johnson, 565 F.2d 179, 182 (1st Cir. 1977),
cert. denied, 434 U.S. 1075 (1978)        .        .        .        .        .        16

United States v. Kelly, 707 F.2d 1460, 1468 (D.C. Cir.),
cert. denied, 464 U.S. 908 (1983)        .        .        .        .        .        16

United States v. Klimavicius-Viloria, 144 F.3d 1249, 1257 (9th Cir. 1998)    22

United States v. Lau Tung Lam, 714 F.2d 209 (2d Cir. 1983)    .    19

United States v. Myers, 692 F.2d 823, 837 (2d Cir. 1982),
*cert. denied,* 461 U.S. 961 (1983)    .    .    .    .    .    16,23

United States v. Nichols, 877 F.2d 825, 827 (10th Cir. 1989).    .    16

United States v. Peterson, 812 F.2d 486 (9th Cir. 1987)    .    .    22

United States v. Quintana, 508 F.2d 867, 878 (7th Cir. 1975)    .    16

United States v. Russell, 411 U.S. 423, 432-432 (1973)    .    .    15

United States v. Scrushy, 366 F.Supp.2d 1134, 1140 (N.D. Ala. 2005)    15

United States v. Simpson, 813 F.2d 1462 (9th Cir. 1987)    .    .    16

United States v. Stein, 495 F.Supp.2d 390, 415 (S.D.N.Y. 2007)    .    15

United States v. Stringer, 408 F.Supp.2d 1083 (D.Or. 2006).    .    15

United States v. Twigg, 588 F.2d 373, 380 (3d Cir. 1978)    .    .    16,17

United States v. Verdugo-Urquidez, 494 U.S. 259 (1990)    .    .    10

United States v. Wallace, 85 F.3d 1063 (2d Cir. 1996)    .    .    19

United States v. West, 511 F.2d 1083 (3d Cir. 1975).    .    .    16,17

United States v. Yousef, 327 F.3d 56 (2d Cir. 2003) .    .    .    9,10,20,21

United States v. Yunis, 924 F.2d 1086 (D.C. Cir. 1991)    .    .    9

World-Wide Volkeswagen v. Woodson, 444 U.S. 286, 297 (1980) .    22


(Constitutional Provisions and Statutes)

Federal Rule of Criminal Procedure 7(d)    .    .    .    .    24

United States Constitution, Amendment V    .    .    .    .    passim

(<u>Law Review Articles and Treatises</u>)

Black's Law Dictionary, 5th Ed., West Pub. Co., 1979          .          .          24

Colengelo, Anthony J., <u>Constitutional Limits on Extraterritorial</u>
<u>Jurisdiction: Terrorism and the Intersection of National and</u>
<u>International Law</u>, Harvard Int'l L.J.48 - 121, 158 (Winter 2007)     .          8

"The Evil Men Do Lives After Them."

> Special Agent John Archer to defendant Al-
> Ghazi during flight from Romania to U.S.
> *quoting*, Shakespeare, Julius Caesar

1.    <u>Introduction</u>

During the flight from Romania to the United States, defendant Tareq Mousa al-

Ghazi asked DEA Special Agent John Archer why the DEA targeted him.  The agent

explained that the DEA was interested in co-defendant Monzer al Kassar.  When al-Ghazi

explained that he hadn't had any dealings with al-Kassar in over fourteen years, the agent

asked al-Ghazi whether he was familiar with the works of William Shakespeare, and went

on to quote, from <u>Julius Caesar</u>, Marc Anthony's speech following Caesar's assassination

during which he said, "the evil that men do lives after them."  (DEA 6 Report, October 16,

2007).   The DEA's motives in targeting al-Ghazi and the manner in which this

investigation was conducted will be reviewed at length.

Not every case features broad Shakespearean themes of how far our constitution

allows American law enforcement to go in luring non-U.S. citizens located abroad into the

commission of U.S. crimes.  This case does.  The first theme is whether the U.S.

Government may lawfully target someone whom the Government knows is not currently

breaking any law, nor has any future intention of doing so, solely as a means to build a

case against someone else.  Here, Tareq Mousa al-Ghazi was living in Lebanon, was not

breaking the law, and was targeted by a DEA operative solely because decades ago the

DEA believes he may have conducted a legal arms transaction with Monzer al-Kassar.

The second theme is how far the Government may go in creating and perpetrating

purported criminal offenses, and in inducing others into participating, however passively

and minimally, in the offenses the Government itself created.[1]  Here, the Government

lured defendant al-Ghazi into alleged crimes that were conceived of and perpetrated

almost exclusively by the Government.

The third theme is whether the government may engage in all of this conduct, not

in the United States, but wholly in foreign countries such as Lebanon and Spain, which

were not advised of the long-term undercover operation the Americans were running

within their borders.  The DEA investigation here began in Lebanon, where a DEA

operative first approached al-Ghazi, and then continued in Spain, where the Government

staged meetings between the defendants.  It is counsel's belief that at no time did the U.S.

Government inform the authorities of either Lebanon or Spain that the United States was

conducting an undercover law enforcement investigation against non-U.S. citizens within

their borders, despite the existence of a Mutual Legal Assistance Treaty (MLAT)

obligating the U.S. to do so.

The fourth theme is whether the government may create enforceable violations of

U.S. law against non-U.S. citizens abroad, who have no connection with the U.S., solely

by directing government operatives to make certain misrepresentations to them.  Here,

none of the defendants is a U.S. citizen, none of the conduct relating to the first four

counts took place in the United States, and defendants have no contacts with the U.S.

Moreover, the evidence suggests that absent the Government's sting, defendant al-Ghazi

would have lived out the rest of his days in Lebanon without violating the laws of, or so

much as having a second thought about, the United States of America.  These four themes

_____

[1] Counsel is not conceding that al-Ghazi in fact participated in the charged offenses.
Instead, for the purposes of these motions, counsel is content to consider the government's
evidence in the light most favorable to the government

and others will be addressed in POINT ONE, in which defendants contends that the

specific factual circumstances of this unprecedented, international "sting" operation taking

place wholly in other countries amount to a violation of due process under the Fifth

Amendment to the U.S. Constitution.

In the bluntest terms, the fact that Mr. al-Ghazi, if convicted, will likely die in an

American jail for conduct that was completely made up by the U.S. Government to be a

violation of U.S. law, solely as a means to drag him and the DEA's ultimate prize, Monzer

al-Kassar, to the U.S. to be judged under U.S. law in a U.S. Court is an affront to the Fifth

Amendment. It must not be allowed. For the reasons that follow, defendant al-Ghazi (and

defendant Godoy, who joins in these motions) move to dismiss all counts against them in

the indictment. In the alternative, defendants request a pre-trial evidentiary hearing at

which the factual basis for the alleged due process violations may be fully examined and

passed upon by this Court.

    2.    <u>Factual Background</u>[2]

Special Agent Archer's quote referred to the fact that when the DEA sent an

operative (SNH)[3] to al-Ghazi's home in southern Lebanon in June or July 2005, the U.S.

Government had no evidence that al-Ghazi was breaking any law of the U.S. or Lebanon,

nor had any intention of doing so. Indeed, Mr. al-Ghazi, 62 years old, was living with his

wife, Amal, and their two children, and making a very modest and law-abiding living.

The "evil" cited by S.A. Archer refers to the Government's belief that two decades ago,

---

[2] The factual recitation here is intended to supplement the allegations in the indictment and is not intended to be all-inclusive.

[3] In order to maintain the confidentiality of the DEA sources, they will be identified by their initials.

al-Ghazi engaged in arms transactions. However, it is not alleged that any supposed

transaction was illegal or was related to the U.S.

Nonetheless, during the Summer of 2005, a total stranger (SNH) one day showed

up at Mr. al-Ghazi's home. Wearing nice clothes and smoking an expensive cigar, SNH

had been tasked by the DEA to play the role of a wealthy businessman. He said he had

been looking for al-Ghazi and wanted to do business with him. Al-Ghazi asked why

SNH would want to do business with a poor man like al-Ghazi. SNH said he had been

referred to al-Ghazi and hoped they could establish a long-term business relationship.

During this first meeting and phone calls thereafter, SNH indicated that the business he

contemplated was completely legitimate.[4]

Al-Ghazi and the DEA operative met a second time at a restaurant in Beirut and

a third time at a restaurant in southern Lebanon. These meetings, as well as the phone

calls scheduling them, were purely social in nature; no business was discussed.

Apparently, the DEA was interested in developing an actual friendship between al-Ghazi

and SNH and was willing to invest the several months necessary to create it.

At about the fourth meeting between the two men, SNH brought up for the first

time his business proposal, specifically that SNH had a customer in the government of

the Ivory Coast interested in buying 1,000 rifles. Al-Ghazi told SNH that he would need

a legitimate end user certificate issued by the government in order for the transaction to

be lawful.[5] Al-Ghazi also warned that he believed the United Nations had imposed a

---

[4] Counsel is not in possession of any recording of this critical first meeting or of the
phone calls thereafter. If this meeting or these phone calls were in fact taped or
transcribed, or reflected in a DEA report, counsel requests such materials.

[5] One of the conversations during which al-Ghazi insisted on an end user certificate was
recorded on February 28, 2006 as N-17. To date, however, no transcript has been made

4

weapons embargo on the Ivory Coast, which prevented SNH from legally selling weapons to the Ivory Coast even with an end user certificate. These same topics of conversation continued over the course of several meetings and phone conversations between the two men. It is significant that al-Ghazi consistently expressed a genuine concern that their business be legal in all respects.

In early 2006, after al-Ghazi and SNH had been speaking for about eight months, SNH for the first mentioned the name of Monzer al-Kassar. SNH said that SNH's client insisted on dealing with al-Kassar and that the deal would not go through without his involvement . Al-Ghazi explained that his relationship with al-Kassar was not strong, that they were not friends anymore, and that al-Ghazi had no intention of conducting any business with al-Kassar. Al-Ghazi's recounting of his relationship with al-Kassar is corroborated by the Government's Affidavits supporting al-Kassar's extradition which allege that al-Kassar and al-Ghazi may have conducted some type of arms business two decades earlier; however, there are no allegations of any such business arrangement between al-Kassar and al-Ghazi in the past 15 or so years, except of course for the "sting" operation conducted here.[6] Additionally, the tape-recorded conversations show al-Ghazi's clear reluctance to deal through al-Kassar in the proposed arms deal.

However, SNH persistently and repeatedly warned al-Ghazi that al-Ghazi stood to derail the weapons deal (which at this point was represented to be entirely lawful), as

_____

of N-17. Additionally, counsel believed that the DEA may have recorded earlier conversations where al-Ghazi stated to SNH that end user certificates were needed. Counsel is not currently in possession of any DEA reports or tapes reflecting such conversations.

[6] The Affidavit of Leslie Brown indicates that a DEA witness stated that between 1982 and 1986, the witness assisted al-Ghazi and al-Kassar, as well as others, facilitate weapons deals.

well as al-Ghazi's and SNH's commissions, if he continued to refuse to deal with al-Kassar. After much pressure, al-Ghazi phoned al-Kassar and informed him that he had been speaking with SNH, who was interested in conducting a lawful firearms transaction with him.

Over the ensuing months, the DEA, through its operatives, cajoled and induced a meeting between al-Ghazi, al-Kassar and SNH. On December 28, 2006, a year and a half after SNH first darkened al-Ghazi's doorstep and almost a year after al-Kassar's name was first brought up, this meeting took place in southern Lebanon. The transcript of the Arabic conversation shows that once SNH and al-Kassar met, al-Ghazi became, at most, a spectator, adding nothing to the arrangements being made. The face-to-face meeting between the DEA's ultimate quarry, al-Kassar, and SNH marked the end of al-Ghazi's usefulness to the undercover operation. Significantly, at all times that al-Ghazi spoke to al-Kassar in anticipation of the first meeting with SNH, al-Ghazi had been told only that the arms deal was purely legitimate.

At the December 28, 2006 meeting, SNH continued to state solely that the proposed deal was legal and was being conducted pursuant to a genuine end user certificate. On the contrary, there was no discussion at this December 28, 2006 meeting, or during any prior meeting or conversation, (1) that the weapons deal was illegal, (2) that SNH or anyone else had any interest whatsoever in killing U.S. Nationals, (3) that SNH or anyone else had any interest in killing employees of the U.S., (4) that the weapons deal may involve missiles, or (5) that the weapons were purportedly being provided to a foreign terrorist organization. This is significant because up until the point that al-Ghazi introduced al-Kassar to SNH, and for at least the first meeting in Lebanon

6

in December 2006, al-Ghazi had every reason to believe the proposed arrangement was

entirely lawful.   The next meeting did not take place until February 2007.  According to

the Government, it was at this meeting that the DEA operatives said things to the

defendants that served to make this purported arms transaction illegal.[7]

For reasons that are unclear, the crucial meetings from February 7, 2007 were not

tape-recorded.  However, later meetings were.  As made clear in the tape transcripts of

the later meetings[8], al-Ghazi played almost no role whatsoever in the negotiations during

the series of meetings in Spain during Spring 2007.  In part, this is due to the fact that

CS-1 and CS-2, the DEA operatives posing as the weapons buyers, spoke Spanish, a

language neither spoken nor understood by al-Ghazi, who speaks only Arabic.  The

majority of the conversation concerning the details of the proposed weapons transaction

was in Spanish.  Therefore, there is no evidence that al-Ghazi actually understood what

was being discussed.  As indicated above, he was present at these meetings as the guest,

and at the expense, of a DEA operative, SNH.   Therefore, there is no reason to expect

---

[7] The way the indictment is written corroborates this premise.  Although the charging
language of Count One – Conspiracy to Kill United States Nationals – states that the
conspiracy began in February 2006 and continued until May 2007, the overt acts set forth
do not begin until February 2007, a full year after the alleged start date of the conspiracy.
See Indictment S3 07 Cr. 354 (JSR) (hereinafter Indictment), para's 9 and 11.  Counts
Two, Three and Four each incorporate by reference the overt acts of Count One.
Considering that the Government has charged 58 overt acts between February 2007 and
June 2007, the question becomes whether the defendants did anything to further the
charged conspiracy for the year between February 2006 and February 2007.   The answer
is the defendants did not because, even according to the Government, the agreement to
sell arms did not truly become illegal until February 2007, when the DEA operatives
began discussing for the first time certain subjects that may have made the otherwise
lawful transaction unlawful in some regard.
[8] As of the date of these motions, the Arabic and Spanish conversations have been largely
translated into English.  However, the Arabic and Spanish translations have not been
unified into one transcript.

that al-Kassar or anyone else would update al-Ghazi on the progress of the weapons

transaction being discussed in Spanish.

## POINT ONE

THE PROSECUTION OF THESE NON-U.S.-CITIZENS FOR CRIMES
CREATED BY DEA OPERATIVES DURING A "STING" OPERATION IN OTHER
COUNTRIES AND REGARDING PURPORTED OFFENSES TO OCCUR IN
COLOMBIA VIOLATES DEFENDANTS' RIGHTS TO DUE PROCESS
UNDER THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION

The Fifth Amendment to the U.S. Constitution provides, in part, "No person

shall…be deprived of life, liberty, or property, without due process of law." U.S. Const.,

amend. V. As will be shown in detail below, the Fifth Amendment Due Process clause

constrains the U.S. Government in the types of prosecutions it may bring and in the

manner such cases are investigated.[9] Courts historically have given the Executive Branch

wide latitude in this area. However, as the cases cited below show, there are limits

imposed by the Constitution.[10] This case is beyond those limits. There is simply no

precedent for the U.S. Government prosecuting (i) citizens of other nations having no

connection to the U.S., (ii) following a "sting" operation, (iii) conducted wholly in other

countries.

---

[9] Even if the Court rejects the argument that the charged statutes do not provide
extraterritorial jurisdiction to cover the alleged conduct, see Memo of Law of Moreno-
Godoy, that does not end the inquiry. "Unlike structural limitations on extraterritorial
jurisdiction which determine Conress's power to legislate in the first instance, Fifth
Amendment due process limits profess to insulate individual defendants from the
application of an otherwise valid legislative enactment." Colengelo, Anthony J.,
Constitutional Limits on Extraterritorial Jurisdiction: Terrorism and the Intersection of
National and International Law, Harvard Int'l L.J.48 - 121, 158 (Winter 2007).
[10] In addition to the U.S. Constitution, a doctrine exists whereby the Federal Court may
exercise some measure of oversight over the conduct of law enforcement. The status of
this doctrine is unclear. Therefore, defendant has premised these arguments on the Fifth
Amendment.

This case is drastically different from those instances where the U.S. Government lawfully reached around the globe to bring defendants to the U.S. for trial.  See United States v. Yousef, 327 F.3d 56 (2d Cir. 2003)(plot to blow up U.S. commercial airliners in Asia); United States v. Bin Laden, 92 F.Supp. 2d 189 (S.D.N.Y. 2000)(bombings of U.S. Embassies in Africa); United States v. Yunis, 924 F.2d 1086 (D.C. Cir. 1991)(hijacking and destroying Royal Jordanian airliner in Lebanon).  Four primary reasons make this case distinguishable from the others.  First, the crimes here were invented by the U.S. Government, whereas in prior cases the defendant's conduct posed an actual threat to recognized U.S. interests.  Second, absent U.S. involvement and encouragement, there is no evidence these defendants would have violated any U.S. law.  Third, the DEA operatives over-reached in creating and perpetrating the charged criminal offenses. Fourth, the U.S. authorities flouted the Mutual Legal Assistance Treaty (MLAT) between the U.S. and Spain and conducted a long-term U.S. law enforcement operation in Spain and in Lebanon without informing the proper authorities and without following the procedural mechanisms provided in the MLAT.  This is also in violation of principles of international comity where, at a minimum, one nations may not pretextually create criminal violations in another nation so as to then investigate the violations and arrest the non-U.S. offenders.

These critical distinctions go to the heart of the Fifth Amendment violation in this case, making this case truly unique, constitutionally-unsustainable and a dangerous precedent for the future.  The prospect that the U.S. Government may now enter the business of conducting undercover law enforcement "sting" operations in foreign nations without informing the proper authorities of those sovereign nations, under circumstances

9

where the Government has no evidence that the non-citizen targets of such "sting"

operations are breaking, or intend to break, U.S. law is a precarious and monumental step

in the history of American law enforcement.  One of the doctrines serving to check this

otherwise unlimited Executive power is the Due Process provision of the Fifth

Amendment.[11]

> 1.     Defendants Al-Ghazi and Moreno Godoy Have The Right To Due Process
>        Of Law Under The Fifth Amendment To The U.S. Constitution

Unlike the Fourth Amendment, which has been held to not apply to searches in

other countries, see United States v. Verdugo-Urquidez, 494 U.S. 259 (1990), the Fifth

Amendment applies to the prosecution of "persons" in this country.  See Yousef, 327

F.3d at 111-112 (Second Circuit conducted due process analysis).  It is not anticipated the

Government will argue that the Fifth Amendment does not apply.  If it does, this issue

will be further addressed in defendant's reply brief.

> 2.     The Government Was So Involved In The Creation Of the Charged U.S.
>        Offenses As To Violate Defendants Due Process Rights Under the Fifth
>        Amendment to the U.S. Constitution
>
>        A.     The Nature of the Government's Investigation

A review of the translated transcripts and other discovery indicate that the

Government was so deeply involved in luring the defendants into the arms deal and then

in creating and committing the purported offenses that its conduct violated defendants'

Fifth Amendment right to Due Process.  The Government, through its operatives, is

---

[11] Another would be customary international law, which recognizes five bases of criminal
jurisdiction: (1) the objective territorial principle; (2) the nationality principle; (3) the
protective principle; (4) the passive personality principle; and (5) the universality
principle.  See United States v. Yousef, 327 F.3d 56 (2d Cir. 2003).  However, it appears
the Yousef decision relegates customary international law to a secondary position, noting
"the government is not required to prove that its prosecution of Yousef comported with
any of the customary international bases of criminal jurisdiction."  Id. at 110.

almost exclusively responsible for the criminal offenses it now charges.  First, it was the

Government that first approached al-Ghazi, who was living a law-abiding, modest life in

southern Lebanon in Summer 2005 and suggested that he become involved in what

started out as an entirely legal arms deal.  Second, after so involving al-Ghazi, the

Government executed a classic "bait and switch" by repeatedly telling him, over the

course of 18 months, that the arms transaction the Government proposed was legal and

was pursuant to an authentic end-user certificate, and then, only after convincing him to

travel to Spain to meet several DEA operatives and his co-defendants, and paying for his

plane ticket, for the first time represent that were going to the FARC.  Third, it was the

Government that produced the end-user certificate critical to the arms transaction being

successful.  Fourth, it was the Government operatives who gratuitously regaled the

defendants with tales and motives of the FARC, such tales being met generally with

polite rejoinders or, more commonly, utter indifference.  Fifth, it was the Government

that approached al-Kassar about buying surface to air missiles after getting him interested

in the arms deal for other weapons.  Sixth, the Government attempted to involve

defendants al-Ghazi and Moreno-Godoy in independent drug transactions, which

invitations were flatly rejected by each defendant.

  In addition to violating defendants' due process rights through the over-reaching

nature of the undercover investigation, the Government also committed at least two forms

of misconduct in the international arena.  First, it violated the MLAT treaty by

conducting this investigation oversees without notifying the proper authorities.  Second,

it violated recognized rules of comity and fairness by engaging in law enforcement

operations in other countries when no crime had been committed.  On this last point, this

court in United States v. Bin Laden, 92 F.Supp.2d 189 (S.D.N.Y. 2000) *quoting* United States v. Caicedo, 47 F.3d 370, 372 (9th Cir. 1995), noted that "punishing a crime committed on foreign soil …is an intrusion into the sovereign territory of another nation. As a matter of comity and fairness, such an intrusion should not be undertaken absent proof that there is a connection between the criminal conduct and the United States sufficient to justify the United States' pursuit of its interests." Id.  Not only was there no crime committed on foreign soil in this case, the DEA specifically went to other countries to suggest one and to solicit the defendants' complicity.  This activity should be fully reviewed by this Court at a pre-trial hearing after which this Court will find the Government's investigation violated defendant's due process and basic principles of international comity.

In order to appreciate the overwhelming degree to which the DEA operatives themselves created these make-believe United States offenses through meetings and conversations in Spain and Lebanon, a brief review must be conducted of the charged crimes and the allegations in the Superseding Indictment supporting such offenses.  The first four counts charge four different conspiracies: (1) conspiracy to kill U.S. nationals; (2) conspiracy to kill officers and employees of the U.S.; (3) conspiracy to acquire and use anti-aircraft missiles; and (4) conspiracy to provide material support or resources to a foreign terrorist organization ("FTO").  In evaluating the degree of governmental involvement in the criminal activity, the analysis must be focused on the crimes actually charged and not on other crimes or potential crimes.  In other words, the question is how much the DEA operatives were involved in creating and perpetuating the charged conspiracies involving murder of U.S. nationals or employees, acquiring missiles and

providing support to FTOs.  In this analysis, it must be remembered that the defendants

are not charged with engaging in illegal activity involving potentially false end-user

certificates, nor are they charged with improprieties involving the proposed arms deal in

some general sense.

As alleged in the indictment, the first people to mention the FARC were the DEA

operatives.  Significantly, this reference was made eighteen months after al-Ghazi first

starting speaking with SNH, during which time SNH maintained that the arms deal was

legitimate and was being conducted pursuant to a genuine end user certificate.  It was not

until SNH convinced al-Ghazi to fly to Spain, and paid for his flight, that for the very

first time the DEA operatives CS-1 and CS-2 mentioned that the  FARC was allegedly

involved in the otherwise legal and genuine arms transaction.  To this extent, it is clear

that the Government baited al-Ghazi into the arrangement by telling him the deal was

legal and then, once he committed himself to the deal by traveling to Spain, switched the

arrangement and represented that the weapons were being sent to the FARC.

Also significant is the fact that the DEA, and not al-Kassar or anyone else, paid

for al-Ghazi to travel from Lebanon to Spain.  It must be remembered that by the time of

the February 2007 trip to Spain, al-Ghazi and SNH had forged an 18 month long

friendship.  So, when it came time to meet with al-Kassar in Spain, al-Ghazi traveled

there at the request of SNH, not al-Kassar.  In particular, SNH warned al-Ghazi that

unless he went to Spain personally, he ran the risk of losing his commission in the event

the arms deal was consummated.  To further ensure al-Ghazi's travel, the U.S.

Government paid for his airfare.

As can be gleaned from the indictment, al-Ghazi played no role in the meetings on February 6th and 7th 2007. It is not alleged that al-Ghazi did or said anything to further the arms transaction in any way. His role was solely that he was present, and he was present solely because the DEA flew him there. Moreover, it appears that co-defendant Moreno Godoy was not present for these meetings.

Indeed, the first act attributed to al-Ghazi in the indictment took place on March 27, 2007, when he advised the CSs on how to negotiate with al-Kassar. This allegation, when taken in conjunction with the fact that the DEA operative paid for al-Ghazi's travel, illustrates a critical point: specifically that al-Ghazi was aligned, if at all, with SNH and not with al-Kassar. When the court passes on the government's efforts to create a conspiracy between al-Ghazi, al-Kassar and Moreno Godoy to kill Americans, support foreign terrorism and ship missiles, the Court is encouraged to consider the fact that al-Ghazi was present at some of these meetings, not as a co-conspirator of al-Kassar, but at the prompting of the DEA operative, SNH. This conclusion is all the more apparent when, as the Indictment also alleges, the DEA CSs allegedly paid 4,000 Euros to al-Ghazi for his assistance in arranging the weapons transaction with al-Kassar. The significance of al-Ghazi being aligned with SNH, and not al-Kassar, is that it made al-Ghazi more vulnerable to the manipulative efforts of the Government to include him in the meetings.

B.    Due Process and Over-Reaching Government Conduct

As a starting point, defendant acknowledges that a due process defense based on government overreaching is appropriate in the rarest of cases. However, several recent cases have applied the doctrine where the government severely manipulated the

14

processes by which an investigation was conducted to the detriment of the target or defendant. For instance, in United States v. Stein, 495 F.Supp.2d 390, 415 (S.D.N.Y. 2007) this court dismissed the indictment against thirteen defendants because the government's pressure on a corporate target resulted in the cutting off of attorney's fees. The court held that this type of investigative overreaching "shocked the conscience" and amounted to "outrageous government conduct." Id. In United States v. Stringer, 408 F.Supp.2d 1083 (D.Or. 2006), the court found that the Government's use of a parallel civil case to gather evidence in a criminal case was "so grossly shocking and so outrageous as to violate the universal sense of justice." Id. at 1089. In United States v. Scrushy, 366 F.Supp.2d 1134, 1140 (N.D. Ala. 2005), the court found that the simultaneous use of civil and criminal proceedings so manipulated the criminal justice system that dismissal of the perjury counts against the defendant was warranted. These three decisions together stand for the proposition that the government can so manipulate the existing rules governing criminal cases – whether such relate to criminal discovery or attorney's fees or other matters – that the defendant's right to due process is violated.

One of the areas where due process violations have been found is where the Government over-reaches in conducting a "sting" operation. The Supreme Court of the United States has acknowledged the existence of the defense in this context, while stating that it should apply in only the most extreme cases. Hampton v. United States, 425 U.S. 484, 495 (1976) ruled that under the Due Process clause of the Fifth Amendment, a prosecution is barred where "police over-involvement in crime…reach(es) a demonstrable level of outrageousness." In United States v. Russell, 411 U.S. 423, 432-432 (1973), the court held that government conduct violates the constitution where it goes

15

beyond "that fundamental fairness, shocking to the universal sense of justice" mandated by the Fifth Amendment.  Id. at 431-432 *quoting* Kinsella v. Unites States ex rel Singleton, 361 U.S. 234, 246 (1960).

Despite the high standard set by the Supreme Court, several Circuit Courts and District Court have dismissed charged offenses on the basis of police over-involvement in an undercover investigation.  See United States v. Twigg, 588 F.2d 373, 380 (3d Cir. 1978); United States v. West, 511 F.2d 1083 (3d Cir. 1975); United States v. Greene, 454 F.2d 783, 787 (9th Cir. 1971)("we do not believe the Government may involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators"); United States v. Gardener, 658 F.Supp. 1573 (W.D. Pa. 1987); United States v. Baltres-Santolino, 521 F.Supp. 744 (N.D.Cal. 1981).

Moreover, the vast majority of the circuits have explicitly recognized the viability of the defense under the appropriate facts.  See United States v. Johnson, 565 F.2d 179, 182 (1st Cir. 1977), *cert. denied,* 434 U.S. 1075 (1978);  United States v. Myers, 692 F.2d 823, 837 (2d Cir. 1982), *cert. denied,* 461 U.S. 961 (1983); United States v. Jannotti, 673 F.2d 578, 607 (3d Cir.) (*en banc*), *cert. denied,* 475 U.S. 1106 (1982);  United States v. Arteaga, 807 F.2d 424, 426 (5th Cir. 1986); United States v. Quintana, 508 F.2d 867, 878 (7th Cir. 1975); United States v. Jacobson, 916 F.2d 467, 469 (8th Cir. 1990)(*en banc*), *rev'd on other grounds*, 503 U.S. 540 (1992); United States v. Simpson, 813 F.2d 1462 (9th Cir. 1987); United States v. Nichols, 877 F.2d 825, 827 (10th Cir. 1989); United States v. Capo, 693 F.2d 1330, 1336 (11th Cir. 1983); United States v. Kelly, 707 F.2d 1460, 1468 (D.C. Cir.), *cert. denied*, 464 U.S. 908 (1983).

The Second Circuit in <u>United States v. Archer</u>, 486 F.2d. 670 (2d Cir. 1973)

addressed the issue directly when it noted that the Government's "attempt to set up a

federal crime for which these defendants stand convicted went beyond any proper

prosecutorial role and needlessly injected the Federal Government into a matter of state

concern." <u>Id.</u> at 672. The court in <u>Archer</u> ultimately reversed the convictions and

dismissed the indictment on the "more limited ground that the Government did not

provide sufficient proof of use or agreement to use interstate or foreign telephone

facilities to satisfy the requirements of the so-called "Travel Act." <u>Id.</u> Nonetheless, the

clear message in <u>Archer</u> is that under the appropriate facts, the court retains the authority

to dismiss an indictment where the government over-reaches in a "sting" operation.

The Third Circuit in <u>Twigg</u>, perhaps the most widely cited case in this area,

reversed a drug conviction where the government "implanted the criminal design in the

(defendant's) mind…set him up, encouraged him…and when he and his codefendant

encountered difficulties in consummating the crime, they assisted in finding solutions."

<u>Twigg</u>, 588 F.2d at 381. The Third Circuit summarized its holding as follows: "the

nature and extent of police involvement in this crime was so overreaching as to bar

prosecution of the defendant as a matter of due process of law." <u>Id.</u> at 377. Even prior to

<u>Twigg</u>, the Third Circuit reversed a conviction on the grounds of fundamental fairness.

<u>See</u> <u>United States v. West</u>, 511 F.2d 1083 (3d Cir. 1975).

Under the reasoning of the Second Circuit's decision in <u>Archer</u>, and the

persuasive authority of the Ninth Circuit's decision in <u>Greene</u> and the Third Circuit's

decision in <u>Twigg</u>, this court is urged to dismiss the indictment against the defendants

due to the over-involvement of the DEA operatives in both bringing these crime into

17

existence and in manipulating the facts to arguably achieve federal jurisdiction to activity

that otherwise would have no connection to the U.S.  For the reasons set forth above, the

DEA over-reached in the "sting" investigation and violated principles of international

comity, infringing defendants' rights to due process.

      3.      <u>The Government Improperly Manufactured Federal Jurisdiction</u>

      Each fact tending to support a violation of U.S. law was intentionally supplied

solely by the Government for the exclusive purpose of creating what the Government

hopes to be prosecutable offenses in this country.  The defendants, at most, intended to

sell weapons.  Such an activity may be lawful, if done with a legitimate end user

certificate, or unlawful without one.[12]  However, the Government transformed this

weapons transaction into violations of U.S. law by misrepresenting that the weapons were

going to the FARC.  By so doing, the U.S. Government sought to acquire the ability to

prosecute three non-United States citizens for conduct conceived of by the U.S.

Government in other countries and in regard to "virtual" offenses allegedly in Colombia.

The future ramifications of similar law enforcement "sting" operations around the globe,

having no connection to the territorial United States, harken to the concerns raised by

Judge Friendly 25 years ago in <u>Archer</u> regarding the growing scope of federal criminal

law.  The context of that case, an undercover operation in Queens, New York, seems

quaint in comparison to the international operation here involving Lebanon, Spain,

Romania and Colombia.  In Archer, Judge Friendly observed, "the initiation of this

investigation was founded on a grossly inflated conception of the role of the federal

---

[12] It is not clear what law would be violated by selling weapons without a legitimate end user certificate.  In any event, there would not appear to be U.S. jurisdiction over such a violation taking place in Spain.

criminal law," Id. at 677, and noted that the court retained the power to "dismiss a prosecution as an abuse of federal power." Id. at 678.   With those prescient insights as their lodestar, the court then focused on the three interstate telephone calls the Government relied upon for federal jurisdiction and found they were either incidental, or, more to the point, "totally fabricated" by the Government, prompting the court to dismiss the indictment.

Here, the DEA operatives carefully crafted the plot so as to transform a lawful weapons transaction into a global conspiracy to kill Americans in Colombia.  Amazingly, this alchemy required only a few misrepresentations on the part of the operatives.  Cases such as United States v. Wallace, 85 F.3d 1063 (2d Cir. 1996) and United States v. Lau Tung Lam, 714 F.2d 209 (2d Cir. 1983) are distinguishable.  In Wallace, defendants were intending to deposit stolen checks from an employee pension fund.  With this criminal design already in place, defendants unwittingly enlisted the criminal assistance of an FBI informant, who provided them with bank deposit slips.  Defendants thereafter objected to their bank fraud conviction, claiming the FBI cooperator, by providing the deposit slips, created jurisdiction.  The court rejected this argument, in large part, because the conduct contemplated by defendants was already criminal in nature, though perhaps not the precise one of which they were convicted.  Similarly, in Lau Tung Lam, defendant intended to sell drugs in Europe but not the U.S.  When the DEA convinced Lam to expand his illegal activity to the U.S., and thereafter charged him here, Lam objected and asked to dismiss the indictment pursuant to the court's supervisory powers.  The court denied his request and noted that the U.S. has an interest in prosecuting European drug dealers willing to import drugs to the U.S.  Id. at 210.

19

The DEA here capitalized on the defendants' desire to consummate an otherwise lawful weapons transaction. There was no pre-existing plot by the defendants to break the law until the DEA brought the defendants together and injected illegal elements into the proposed transaction. By so doing, the DEA changed the nature of the conduct from something legal to something that is not only illegal, but a violation of a law no one could reasonably have foreseen. In this manner, the U.S. has violated the defendants Fifth Amendment Due Process rights by unfairly creating federal jurisdiction.

> 4.      Because Defendants Were Lured Into Committing A Crime Against The United States, An Insufficient Nexus Exists Between Them And The United States, Such That Prosecution Of Them Here Violates Their Fifth Amendment Due Process Rights

The Second Circuit has explicitly agreed with the conclusion of the Ninth Circuit that "in order to apply extraterritorially a federal criminal statute to a defendant consistent with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." United States v. Yousef, 327 F.3d 56, 111 (2d Cir. 2003) *quoting* United States v. Davis, 905 F.2d 245, 248-249 (9th Cir. 1990). In applying the Davis standard to the facts before it, the Second Circuit in Yousef found that the assertion of jurisdiction over Yousef was "consistent with due process." Yousef, 327 F.3d at 112. In that case, "(t)he defendants conspired to attack a dozen United States-flag aircraft in an effort to inflict injury on this country and its people and influence American foreign policy, and their attack on the Philippine Airlines flight was a 'test run' in furtherance of this conspiracy." Id. Under these facts, the court concluded, "(g)iven the substantial intended effect of their attack on the United States and its citizens, it cannot be argued seriously that the defendants'

conduct was so unrelated to American interests as to render their prosecution in the United States arbitrary or fundamentally unfair." Id.

Similarly, in Bin Laden, this court found that insofar as the "protective" principle of international law was satisfied by the defendants' bombing two U.S. embassies in Africa, no due process violation occurred.

However, cases such as Yousef , Bin Laden, and Davis, are distinguishable because the defendants there were not lured by the U.S. Government into committing a U.S. crime. Instead, those defendants volitionally sought to destroy U.S. interests as part of anti-American plots they themselves created and developed. The entire nature of the nexus between a defendant and the forum of prosecution indelibly changes when the defendant is lured into committing the conduct that the Government then claims as the basis for the nexus in the first place. This is especially true where, as here, the U.S. Government tried to establish the necessary nexus by violating international principles of comity that prohibited the U.S. Government from engaging in these precise actions in another country. Therefore, a sufficient nexus between the defendants here and the U.S. does not exist because the Government itself lured them into engaging in the conduct comprising the nexus.

Counsel has located no cases where a constitutional nexus between a criminal defendant and a forum has been established by the Government through a "sting" investigation in another country. Indeed, the precise contours of the doctrine are unclear even where foreign defendants purposely and without involvement by the government

21

engage in offending conduct toward the U.S.[13]  For instance, the Ninth Circuit, which has

addressed the issue perhaps more than any other, has equated the due process issue with

limitations based on international law in two older decisions.  See United States v.

Peterson, 812 F.2d 486 (9th Cir. 1987); Rocha v. United States, 288 F.2d 545 (9th Cir.

1961).  However, in a more recent one, Davis, 905 F.2d at 245, it offered a full discussion

of the due process clause independent of international law principles.   This court in Bin

Laden, 92 F.Supp.2d at 219 noted that "(f)ew cases have addressed this sufficient nexus

requirement."  This lack of clarity in the criminal context has prompted courts to borrow

similar principles from civil law.  For example, the court in Bin Laden cited United States

v. Klimavicius-Viloria, 144 F.3d 1249, 1257 (9th Cir. 1998) which quotes from World-

Wide Volkeswagen v. Woodson, 444 U.S. 286, 297 (1980), setting forth due process

considerations in the context of a civil "minimum contacts" test.  Even in a civil context,

where no party faces the prospect of dying in a foreign country's jail, the Supreme Court

has required that a civil defendant engage in "purposeful" behavior in the forum state

before being sued there.[14]  Defendant encourages that this court adopt a constitutional

nexus that is both tighter and more direct than that set forth in civil cases, where the

---

[13] This remarkable lack of clarity also gives rise to an argument that defendants lacked
notice that the charged conduct violates U.S. law.  Such will be addressed in the next
point.
[14] The Supreme Court has identified three considerations: First, whether there is evidence
of some act by which the defendant "purposely availed itself of the privilege of
conducting activities in the forum state, thus invoking the benefits and protections of its
laws." Hanson v. Denckla, 357 U.S. 235 (1958).  Second, whether the defendant's
conduct and connection to the forum state are such that he should reasonably anticipate
being hauled into court there. World-Wide Volkeswagen v. Woodson, 444 U.S. 286
(1980).  Third, whether the defendant carries on a "continuous and systematic" part of its
general business in the forum state. Burger King Corp. v. Rudzewicz, 471 U.S. 462
(1985).  Even under a civil standard, this court has regularly denied jurisdiction in cases
where no substantial contact existed between the defendant and the forum.

consequences pale in comparison and where a private party lacks the ability to

manufacture such nexus, as did the Government here.  At a minimum, courts should not

find a constitutional nexus between a defendant and a forum state in criminal cases where

the Government lured the defendant into committing the actions that serve as the basis of

the nexus.  Such a standard would be consistent with principles of international comity

insofar as it would prevent one nation from creating criminal jurisdiction to prosecute

citizens and residents of another nation.  Additionally, such a standard would be

consistent with a foreign defendant's due process rights in the event he or she is brought

to the U.S. to face criminal charges in this country.

     5.    <u>Defendants Lacked Fair Warning That This Conduct Violated U.S. Law</u>

There is no reason to expect that U.S. law would be violated by an agreement in

Spain to provide weapons to individuals posing as members of a Colombian paramilitary

organization.  This case is distinguishable from <u>Bin Laden</u>, 92 F.Supp.2d at 218, where

Bin Laden's terrorist organization declared war on the U.S. and thereafter attacked and

destroyed two U.S. embassies, committing mass murder.  Defendants' conduct here on

the other hand was not directed at the U.S. in any way.  Therefore, they simply lack fair

notice that their conduct violated U.S. law.

POINT TWO

<u>A PRE-TRIAL HEARING SHOULD BE ORDERED ON THE DUE PROCESS CLAIM</u>

In the event the Court denies defendants' motion to dismiss the indictment on the

basis of a due process violation, defendants move for a pre-trial hearing at which the

factual predicate for a due process claim may be more fully developed and examined by

the Court.  <u>See</u> <u>United States v. Myers</u>, 692 F.2d 823, 839 (2d Cir. 1982)(Judge Pratt

23

ordered "due process hearing" to amplify record on defendants' due process claim);

<u>United States v. Cuervelo</u>, 949 F.2d 559, 567 (2d Cir. 1991)("a hearing allows for a

searching inquiry into the particulars of the investigative process employed by the

government.").

POINT THREE

<u>SURPLUSSAGE MUST BE REMOVED FROM THE INDICTMENT</u>

Federal Rule of Criminal Procedure 7(d) provides that "the court on motion of the

defendant may strike surplusage from the indictment or information." Surplusage is

generally defined as "extraneous, impertinent, superfluous, or unnecessary matter."

<u>Black's Law Dictionary</u>, 5th Edition, West Publishing Company 1979, p. 1294.  In the

context of a pleading, it is further defined as "allegations of matter wholly foreign and

impertinent to the cause.  All matters beyond the circumstances necessary to constitute

the action.  Any allegation without which the pleading would yet be adequate."  <u>Id</u>.

Although the indictment charges a series of conspiracies commencing in February

2006 and continuing until May 2007, paragraphs 1 through 8 recites acts of unspecified

criminal activity commencing in the early 1970s.  These allegations should be removed

for several reasons.  First, they are misleading and prejudicial to the defendants.  Second,

they serve to expand that case to encompass over 30 years of criminal activity when in

fact only a fifteen month conspiracy is actually alleged.  Third, they serve to end-run

Federal Rules of Evidence 403 and 404(b) by making remote acts admissible as part of

the indictment instead of subject to exclusion as being unduly prejudicial or relevant only

to show the proscribed ground of criminal disposition.

24

POINT FOUR

ABILITY TO FILE ADDITIONAL, APPROPRIATE MOTIONS

Insofar as the English transcription of the Arabic and Spanish conversations is not yet fully complete, defendant reserves the right to make additional motions, as appropriate, based on this evidence.  Defendant also reserves the right to file a brief reply to the Government's response.  Finally, defendant joins in the motions filed by co-defendant Moreno-Godoy.

CONCLUSION

For the reasons set forth in POINT ONE, the indictment should be dismissed; for the reasons in POINT TWO, a pre-trial hearing should be held; for the reasons in POINT THREE, surplusage in the indictment should be removed; and for the reasons in POINT FOUR, defendant is should be permitted to file additional motions, as appropriate.

Respectfully submitted,

Marc Agnifilo, Esq.
(MA-7195)
Brafman & Associates, P.C.
*Attorney for Tareq Mousa al-Ghazi*
767 Third Avenue
New York, New York   10017
(212) 750-7800
Magnifilo@braflaw.com

Dated: March 31, 2008
       New York, New York

To:    Hon. Jed S. Rakoff
       Roger Stavis, Esq.
       AUSA Leslie Brown
       AUSA Boyd Johnson
       AUSA Brendan McGuire
       Tareq Mousa al-Ghazi