UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                       :

UNITED STATES OF AMERICA           :

                                       :

     - v. -                        :         S3 07 Cr. 354 (JSR)

                                       :

LUIS FELIPE MORENO GODOY,     :

                                       :

         Defendant.          :

                                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## GOVERNMENT'S MEMORANDUM IN CONNECTION WITH THE SENTENCING OF LUIS FELIPE MORENO GODOY

LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York
Attorney for the United States
    of America

BOYD M. JOHNSON III
BRENDAN R. MCGUIRE
Assistant United States Attorneys
    - Of Counsel -

# TABLE OF CONTENTS

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

I.  Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  The December 28, 2006, Meeting In Beirut, Lebanon. . . . . . . . . . . . . . . 2

    B.  The February 2007 Meeting In Marbella, Spain. . . . . . . . . . . . . . . . . . 4

    C.  The March 2007 Meetings In Marbella, Spain . . . . . . . . . . . . . . . . . . .. . 7

    D.  The May 2, 2007, Meeting Near Malaga, Spain. . . . . . . . . . . . . . . . . . 11

    E.  Al Kassar And Moreno's May 2007 Travel To Weapons Factories In
        Eastern Europe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    F.  Moreno's Arrest And Search Of Al Kassar's Marbella Estate. . . . . . . . . 14

    G.  Moreno's Extradition To The United States . . . . . . . . . . . . . . . . . . . . . . 16

    H.  The Jury Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

II.  Applicable Legal Principles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.  Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    A.  The Applicable Guidelines Range . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    B.  The 18 U.S.C. § 3553(a) Factors And The Appropriate Sentence . . . . . . . 20

IV.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# TABLE OF AUTHORITIES

*Cases:*

*Gall v. United States*,
   553, U.S. ___, 128 S. Ct. 586 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Booker*,
   543 U.S. 220 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Cavera*,
   550 F.3d 180 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Crosby*,
   397 F.3d 103 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Meskini*,
   319 F.3d 88 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19


*Statutes, Rules & Other Authorities:*

18 U.S.C. § 2332b. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

18 U.S.C. § 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

U.S.S.G. § 3A1.2(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

U.S.S.G. § 3A1.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

U.S.S.G. § 3B1.1(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

U.S.S.G. § 3D1.2(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

iii

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X
                                        :
UNITED STATES OF AMERICA                :
                                        :
   - v. -                               :         S3 07 Cr. 354 (JSR)
                                        :
LUIS FELIPE MORENO GODOY,               :
                                        :
             Defendant.           :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - X

## GOVERNMENT'S MEMORANDUM IN CONNECTION
## WITH THE SENTENCING OF LUIS FELIPE MORENO GODOY

       The Government respectfully submits this letter in connection with the sentencing of Luis Felipe Moreno Godoy ("Moreno") scheduled for February 24, 2009. As described below, Moreno played a pivotal role in Monzer Al Kassar's international arms trafficking organization, a criminal enterprise capable of providing millions of dollars worth of lethal weapons to armed factions engaged in violent conflicts around the world. In the present case, the jury convicted Moreno of agreeing to sell more than 12,000 weapons – including machine guns, rocket-propelled grenade launchers, and surface-to-air missiles – and 2 million rounds of ammunition to men he believed represented the Fuerzas Armadas Revolucionaries de Colombia (the "FARC"), a U.S.- and E.U.-designated foreign terrorist organization. Moreno agreed to provide the weapons and ammunition with the specific understanding that the FARC would use the armaments to kill Americans. Although Moreno's applicable Guidelines sentencing range is life imprisonment, because the Government is not seeking a life sentence against

Al Kassar and Moreno's role was clearly subordinate to Al Kassar's, the Government respectfully submits that a sentence in excess of the applicable 25-year mandatory minimum, but less than the sentence the Court imposes on Al Kassar, would be sufficient but not greater than necessary to accomplish the objectives of criminal sentencing.

## I.  FACTUAL BACKGROUND

In the spring of 2005, the United States Drug Enforcement Administration (the "DEA") initiated a sting operation against Al Kassar.  (Trial Transcript ("Tr.") 338). The DEA's plan was to identify associates of Al Kassar, and then attempt to infiltrate his arms trafficking organization by directing DEA informants to meet with these associates and propose criminal activity that would involve Al Kassar.  (Tr. 343).  As part of this plan, DEA agents instructed a confidential informant named Samir Houchaimi ("Samir") to meet with one of Moreno's co-defendants, Tareq Mousa Al Ghazi, and propose a meeting with Al Kassar to discuss a weapons deal.  (Tr. 344).  The DEA provided Samir with an end user certificate from Nicaragua that contained a list of weapons for him to provide to Al Ghazi.  (Government Exhibit ("GX") 26).  After a series of meetings and telephone calls with Samir, Al Ghazi agreed to arrange a meeting with Al Kassar.  (Tr. 992).

### A.  The December 28, 2006, Meeting In Beirut, Lebanon

On December 28, 2006, Samir met with Al Kassar and Al Ghazi in a suite at the Diplomat Suites Hotel in Beirut, Lebanon, to discuss the weapons deal.  Upon

entering the hotel lobby, Samir and Al Ghazi were met by Al Kassar's bodyguards.  One

of the bodyguards escorted Samir and Al Ghazi to the elevator, and they went up to the

seventh floor.  The bodyguard then took Samir and Al Ghazi past three other bodyguards,

down a hallway, and to a sitting room where they ultimately were met by Al Kassar.  (Tr.

993).

        At the beginning of the meeting, Samir noticed that Al Kassar had with him

the end user certificate that Samir had previously provided to Al Ghazi for the weapons

deal.  (Tr. 994).  During the meeting, Al Kassar, referring to the end user certificate,

confirmed that even if there were problems with the documentation for the weapons deal,

he would find a way to get the transaction done. (GX 28T at 7 (AL KASSAR: "Another

game will have to be played.  We'll get documents from approved countries and we'll

submit them on that basis.  There'll be more complexities . . . I mean, it's more

complicated.// [laughter] For people who are worth taking the trouble for and for the

future, I'm willing to serve . . .").  According to Samir, when Al Kassar indicated that the

deal would be more "complicated," he touched his pocket, signifying that any problems

with documentation for the weapons deal could be solved by money.  (Tr. 998-99).

        At the end of the meeting, Al Kassar invited Samir and his criminal

associates, along with Al Ghazi, to his mansion in Marbella, Spain, to further discuss the

weapons deal.  Al Kassar also offered to use his connections in Spain to determine

whether Samir's criminal associates – the purported purchasers of the weapons – were wanted by law enforcement in Spain before they traveled there.  (GX 28T at 8).

**B.      The February 2007 Meetings In Marbella, Spain**

In early February 2007, at the DEA's instruction, Samir, along with two other DEA confidential informants ("Carlos" and "Luis"), traveled to Marbella, Spain, to meet with Al Kassar and Al Ghazi regarding the weapons deal.  (Tr. 352-53).  In preparation for the meetings, the DEA agents provided Carlos with a typed list of additional weapons to be requested from Al Kassar.  (Tr. 353; GX 160).

On February 6, 2007, the DEA informants met with Al Kassar and Al Ghazi in the living room of Al Kassar's mansion.  Moreno also attended portions of the meeting. (Tr. 631-32).  At the beginning of the meeting, Al Kassar asked Carlos how he could help him, and what the deal was about.  (Tr. 633).  Carlos responded that he and Luis were from Colombia, and that they wanted to buy weapons for the FARC.  Carlos also indicated that although the end user certificate was from Nicaragua, they wanted the weapons to go to Colombia.  (Tr. 633).  After Al Kassar told Carlos that the weapons listed on the end user certificate was a small order for him, Carlos provided Al Kassar with the typed list of additional weapons that he had received from the DEA.  (*Id.*).  In total, the end user certificate and the typed list contained more than 12,000 weapons – including thousands of machine guns, hundreds of assault rifles, more than one hundred

grenade launchers, and thousands of grenades – and 2 million rounds of ammunition. (GX 26; GX 160).

During the meeting, Al Kassar asked Carlos whether he was "for or against the United States," and whether Carlos's group was "getting any financial help from the United States." (Tr. 634). Carlos responded that it was the opposite: the weapons "were going to be used against the United States." (*Id.*). Al Kassar then said that he would help Carlos. Al Kassar made clear, however, that even if Al Kassar stood to make a lot of money, if Carlos and his group had been getting assistance from the United States, he would not have helped them. (*Id.*).

Al Kassar and Carlos then discussed the payment for and transportation of the weapons. (Tr. 635). Carlos asked Al Kassar if there would be any problem with paying him in cash for the weapons. Al Kassar said that it would be no problem. (*Id.*). Carlos also asked Al Kassar for help transporting the weapons, and explained that the weapons would not be going to Nicaragua, but rather to Suriname and ultimately to Colombia. Al Kassar again said that it would be no problem, but that it would cost extra. Al Kassar said that he knew someone who had a boat who could help with the transportation. (*Id.*).

Later that afternoon, in Carlos's presence, Al Kassar called a criminal associate he called "black friend" on the telephone. (Tr. 637). During the call, Al Kassar told his associate that he would be sending him a fax, and that he wanted him to look at

the "certificate" and see whether or not they could do the deal.  (*Id.*).  After completing the telephone call, Al Kassar told Carlos that he would have an approximate price for the weapons later that night.  (Tr. 638).

That evening, Al Kassar, Moreno, Al Ghazi, and the DEA informants went to dinner.  (Tr. 639).  Before going into the restaurant, Al Kassar told Carlos that the weapons deal was going to cost between 7 and 8 million euros, plus the transportation fee.  (*Id.*).

After dinner, Carlos and Luis went to a bar with Al Kassar and Al Ghazi. (Tr. 639).  While he was sitting next to Carlos, Al Kassar told Carlos that he liked Carlos's "cause against the United States."  Al Kassar put his arm around Carlos, and told him that he could provide Carlos with "a thousand men to help fight against the United States."  (Tr. 640).  Al Kassar also told Carlos that he could provide people to train Carlos's people in the use of C-4 explosives, or, alternatively, that Carlos could send his people to Al Kassar's country to be trained at Al Kassar's training camp.  (*Id.*).

The next day, on February 7, 2007, Al Kassar and Al Ghazi met again with the DEA informants in the living room of Al Kassar's estate.  (Tr. 656).  During the meeting, Al Kassar provided Carlos with prices for each of the weapons listed on the end user certificate and on the typed list Carlos had provided the previous day.  (Tr. 656; GX 161).  Al Kassar and Carlos then exchanged contact information, so they could continue discussing the weapons deal.  (Tr. 658-59).

C.     The March 2007 Meetings In Marbella, Spain

In March 2007, Carlos, Luis, and Samir met again with Al Kassar, Al Ghazi, and Moreno in Marbella, and continued their discussions about the weapons deal. (Tr. 690).  On March 27, 2007, the men all met inside the living room of Al Kassar's mansion.  (Tr. 693).  During the meeting, Carlos told Al Kassar that the FARC had never been involved in a deal like the deal they were doing with Al Kassar.  Carlos explained that the FARC usually exchanged its "product" (a reference to cocaine) for the weapons, rather than putting up money for the arms.  (GX 39T at 21).  Carlos also told Al Kassar that "the Americans have been messing around much more with us lately, much more with us."  (*Id.*).

Carlos and Al Kassar then discussed the FARC's need for surface-to-air missiles ("SAMs") to shoot down American helicopters in Colombia.  (Tr. 696-97; GX 39T at 22).  Al Kassar confirmed that two particular types of SAMs were "good to take down helicopters."  (Tr. 697).  Al Kassar and Carlos later discussed the fact that Al Kassar could provide ton-quantities of C-4 explosives to Carlos and his group in Colombia.  (GX 39T at 29-31).  Carlos and Al Kassar also discussed the FARC providing payment for the weapons in increments of 300,000 to 500,000 euros at a time.  (*Id.* at 41).

Carlos, Luis, Al Kassar, and Moreno then discussed using explosives against Americans in Colombia.  (GX 39T at 42-43).  Al Kassar told Carlos that he would send experts to train the FARC in the use of explosives "out of friendship."  (*Id.* at 43).

7

Al Kassar explained to Carlos and Luis that they did not need to run the risk of having Al Kassar send explosives to Colombia; rather, Al Kassar said he would send experts to help them make explosives from materials available locally in Colombia.  (*Id.* at 44).  Al Kassar clarified that he had experts who knew how to make explosives.  Moreno confirmed that the explosives could be made without any raw material.  (*Id.*).

Later on March 27, 2007, Al Kassar provided Carlos with information for a bank account he controlled that could be used to receive payment for the weapons.  (Tr. 713-14; GX 163).  This account was located in Spain, and was under the name "Bilal Hussain" (the "First Account").  (GX 163).  Al Kassar told Carlos that he could transfer up to 500,000 euros to the First  Account.  (Tr. 714).  Al Kassar told Carlos that once he had sent enough money into the First Account, Al Kassar would provide him with additional accounts to receive more payments for the weapons.  (GX 39T at 75).  Moreno later drove Carlos and Luis to an Internet café, where Carlos arranged for the DEA to send 100,000 euros to the First Account as an initial payment on the weapons deal.  (Tr. 719).  On the way to the Internet café, Moreno told Carlos that he himself had written down the account numbers for the First Account; at the café, Moreno also assisted Carlos in confirming the account numbers.  (*Id.*).

On March 27, 2007, Carlos, Luis, and Al Kassar, in Moreno's presence, discussed the fact that the FARC would use the weapons from the deal to kill Americans

in Colombia.  In Moreno's presence, Carlos, Luis, and Al Kassar had the following

exchange:

| | |
|---|---|
| CARLOS | You know, the Americans are bringing . . . they just brought those . . . those . . . those, uh the Apaches into Colombia. . . .  And they're . . . they're making attacks. That's why we want to start to . . . to . . . to kill all of them. [he laughs] |
| LUIS | We have to hit them hard! |
| CARLOS | And kill all of those Americans.  They're bringing them those Apaches . . . // |
| AL KASSAR | And look at what's going on in Iraq. |
| CARLOS | They just took . . . // |
| LUIS | Oh, but in Iraq they're . . . oh! |
| CARLOS | But they're scared in Iraq. |
| | [laughter and unintelligible voices] |
| AL KASSAR | That's right, scared. |
| CARLOS | That's what we want to do over there . . . . |

(GX 39T at 91).

Shortly thereafter, Carlos, Luis, and Moreno, in Al Kassar's presence,

discussed the fact that the FARC financed its terrorist activities with cocaine proceeds.

They also discussed the FARC's plan to retaliate against the United States in Colombia to

protect its cocaine trafficking business:

9

CARLOS           So, uh . . . there's a fight going on right now because they started taking over plantations of . . . of . . . cocaine.  So now . . . they don't want to let go of that business, because you know that business . . . //

MORENO         That's what I had heard about the paramilitaries.

CARLOS           So . . . so now we . . . the . . . we finance ourselves with that.

MORENO         // The FARC finance themselves, but the FARC doesn't produce the [U/I] . . .?

CARLOS           Well, they do, they do.

MORENO         Oh, all right.

CARLOS           We have labs . . . //

LUIS              Of course we do!

CARLOS           // . . . and that's exactly why we're talking about . . . about how we want to provide protection and start our attacks.  You know, right now with these new Apaches that the . . . that Bush just gave them and he . . and he . . . and offered them and then the Apaches arrived . . . //

(GX 39T at 96).

      The following day, March 28, 2007, Carlos, Luis, and Samir met again with Al Kassar, Al Ghazi, and Moreno in the living room of Al Kassar's mansion to discuss the weapons deal.  (Tr. 747).  At the beginning of the meeting, Al Kassar told Carlos that he had received the initial transfer of 100,000 euros.  (GX 41T at 16).  Al Kassar then provided Carlos with (1) a diagram of the cargo vessel that Al Kassar had arranged to transport the weapons (Tr. 748; GX 167); (2) a schematic of the SAM that Al Kassar

10

could sell to the FARC (Tr. 752; GX 166); and (3) another bank account in the name "Bilal Hussain" located in Lebanon (the "Second Account") to be used to receive additional payments for the weapons deal (Tr. 753; GX 168).  Near the end of the meeting, Al Kassar and Carlos discussed arranging a meeting between the captain of the cargo vessel that would be transporting the weapons and one of Carlos's criminal associates, so they could discuss the mechanics of shipping the arms.  (Tr. 756).

   **D.     The May 2, 2007, Meeting Near Malaga, Spain**

   During April 2007, Carlos had a number of recorded telephone calls with Al Kassar and Moreno during which they continued to discuss the weapons deal.  (GX 43T; GX 44T; GX 45T; GX 46T; GX 47T; GX 48T; GX 52T; GX 54T).  During the last two calls, Al Kassar, Moreno, and Carlos agreed to meet together with Carlos's associate and the captain and owner of the cargo vessel in Spain to discuss the transportation of the weapons.  (GX 52; GX 54).

   On May 2, 2007, Al Kassar, Moreno, and Carlos, who was accompanied by another DEA informant ("Spyro"), met with the captain and the owner of the cargo vessel.  The meeting occurred at a restaurant in Torremolinos, Spain.  (Tr. 802-03).  On the way from the Malaga airport to the meeting, Moreno cautioned Carlos not to say anything to the captain and the owner about his "activities," a reference to Carlos's terrorist activities with the FARC.  (Tr. 802; GX 57T at p. 2).  Al Kassar gave Carlos a similar caution before the captain and owner arrived at the restaurant.  (Tr. 806-07).

11

At the restaurant, Carlos told Al Kassar that he should have already received an additional $135,000 in payments for the weapons deal into his bank accounts. (GX 57T at 9). Carlos also told Al Kassar that an additional $165,000 would be sent in the near future. (*Id.*).[1] Al Kassar also provided Carlos and Spyro with a third account in Spain in the name of "Bilal Hussain" (the "Third Account") to be used to receive additional payments in U.S. dollars for the weapons deal. (GX 57T at 37).

During the meeting, Al Kassar and the DEA informants explained to the captain and the owner that while the end user certificate and accompanying shipping documents would claim that the weapons were going to Nicaragua, the weapons were in fact going to be delivered to Suriname:

> SPYRO:          Suriname, yes.
>
> CARLOS:         [U/I] Paramaribo.
>
> AL KASSAR:      He knows this. But as far as the route and everybody knows, we're going to Nicaragua, OK? But the communication [U/I] happening even if you are picked up in some port or some reason or reasons, you're going to Nicaragua because you have a final destination and that's the reason . . . //
>
> SPYRO:          // Final destination.

---

[1]    In total, the DEA sent three wire transfers of $135,000, $50,000, and $115,000 into Al Kassar's bank accounts in Spain on April 30, 2007, May 7, 2007, May 9, 2007, respectively. (Tr. 380-82; GX 175). Combined with the initial March 27, 2007, transfer of 100,000 euros – or approximately $138,000 (Tr. 380) – Al Kassar received more than $400,000 in his bank accounts from the DEA in connection with the FARC weapons deal.

AL KASSAR:         // . . . for the cargo.//

SPYRO:             // Let's put it this way.  Final destination is Nicaragua.

KASAPOGLU:         Nicaragua.

SPYRO:             You have to stop for technical reasons in Suriname . . .

AL KASSAR:         Technical reasons.  Suriname.

SPYRO:             OK, we will give you the cover for that.

KASAPOGLU:         [U/I]?

SPYRO:             Yeah, we will be giving you a cover.

AL KASSAR:         Definitely there will be no problem there, no?

CARLOS:            No.

SPYRO:             At all.  Absolutely no problem.

AL KASSAR:         OK?

SPYRO:             We will give you the cover.

AL KASSAR:         OK, no problem at all. . . .

(GX 57T at 52-54).

Al Kassar also participated in a discussion during the meeting with the captain and the
owner concerning the details of the loading and unloading of the weapons in Eastern
Europe and Suriname.  (*Id.* at 52-53; 58-59).

13

E.      Al Kassar And Moreno's May 2007 Travel To Weapons Factories in
        Bulgaria And Romania

Between May 8-10, 2007, Al Kassar and Moreno traveled arms factories in

Bulgaria and Romania in connection with the FARC weapons deal.  (GX 59T at 2; GX

60T at 1; GX 257; GX 258; GX 408).  During the trip, Al Kassar and Moreno received

price quotes and other information from two weapons factories – Armitrans in Bulgaria

and Romarm in Romania – for the arms the DEA informants had ordered on behalf of the

FARC.  (GX 200; GX 258; GX 259; GX 409-11).

F.      Moreno's Arrest And Search Of Al Kassar's Marbella Estate

In late May 2007, Carlos, at the DEA's instruction, informed Al Kassar and

Moreno that the FARC had approximately 3.2 million euros in cash in Bucharest,

Romania, to pay for the weapons.  (GX 63T at 9).  Al Kassar and Moreno made plans to

meet Carlos in Bucharest on or about June 5 or 6, 2007, to collect the money.  (GX 63T at

11; GX 64T at 4).  Ultimately, only Moreno and Al Ghazi traveled to Romania to collect

the money from the FARC.  (Tr. 842; 1034).  Al Kassar, however, agreed by telephone to

meet with Carlos and Carlos's alleged FARC boss in Madrid, Spain, to finalize the

discussions about the weapons deal.  (Tr. 843).

On June 7, 2007, the DEA coordinated the takedown of the investigation

with their law enforcement partners in Romania and Spain.  On that date, based on

provisional arrest warrants issued upon the Government's request, Romanian authorities

arrested Moreno and Al Ghazi in Bucharest.  (Tr. 379).  At the same time, Spanish

authorities arrested Al Kassar upon his arrival at the Madrid international airport.  (*Id.*).

At the time of his arrest, Al Kassar had in his possession a briefcase that contained

numerous documents relating to the weapons deal, including, but not limited to:  (1) a

new, fake end user certificate that had been created to cover the weapons deal (GX 405);

(2) correspondence and an arms catalogue from Romarm (GX 407; GX 410); (3) an arms

catalogue from Arsenal, an arms factory in Bulgaria, with handwritten notations next to

weapons that Carlos had ordered from Al Kassar (GX 411); and (4) documents

confirming that final arrangements had been made to ship the weapons to Suriname (GX

414; GX 415; GX 416; GX 417).

       The following day, June 8, 2007, Spanish authorities conducted a court-

authorized search of Al Kassar's Marbella mansion.  During the search, the authorities

recovered numerous documents related to the FARC weapons deal.  (*See*, *e.g.*, GX 102;

GX 103; GX 106; GX 108; GX 109; GX 114; GX 115; GX 116; GX 160; GX 211-19;

GX 221-24; GX 226-31; GX 252-53; GX 255-59; GX 261-63).  They also recovered

documents confirming Al Kassar and Moreno's involvement in arms trafficking activities

generally, including the marketing of SAMs on the letterhead of one of Al Kassar's

companies.  (*See*, *e.g.*, GX 101; GX 113; GX 210).  The recovered documents also

provided further evidence of Al Kassar's control of front bank accounts to be used to

launder funds relating to his arms trafficking activities.  (*See*, *e.g.*, GX 113; GX 232; GX

251; GX 256).

### G.     Moreno's Extradition To The United States

After his arrest, the Government formally requested Moreno's extradition from Romania.  After conducting hearings, Romania extradited Moreno to New York on October 17, 2007.  (Presentence Report, dated February 17, 2009 ("PSR") at 2).  He was detained pending trial.  (*Id.*).

### H.     The Jury Verdict

On November 20, 2008, the jury convicted Moreno of all counts in the Indictment.  Sentencing is scheduled for February 24, 2009.

## II.     APPLICABLE LEGAL PRINCIPLES

Under current law, sentencing courts must engage in a three-step sentencing procedure.  *See United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  First, the district court must determine the applicable Guidelines range, and, in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id.* at 112.  Second, the district court must consider whether a departure from that Guidelines range is appropriate.  *Id.*  Third, the court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose.  *Id.* at 113.

Although the Guidelines are no longer mandatory, district courts must continue to "consult" the Guidelines and "take them into account" when sentencing.

16

*United States* v. *Booker*, 543 U.S. 220, 264 (2005); *accord United States* v. *Cavera*, 550

F.3d 180, 187 (2d Cir. 2008) ("In [*Booker*], the Court retained an important role for the

Sentencing Commission, leaving untouched the statutory direction to district courts that

they should consult the Guidelines range when imposing sentence.") (citing *Booker*, 543

U.S. at 245-46).  Because the Guidelines are "the product of careful study based on

extensive empirical evidence derived from the review of thousands of individual

sentencing decisions," *Gall* v. *United States*, 552 U.S. __, 128 S. Ct. 586, 594 (2007),

district courts must treat the Guidelines as the "starting point and the initial benchmark"

in sentencing proceedings, *id.* at 596, and must "remain cognizant of them throughout the

sentencing process," *id.* at 596 n.6.  It also is the Court's duty to form its own view of the

"nature and circumstances of the offense and the history and characteristics of the

defendant," and to then impose a sentence "sufficient, but not greater than necessary," to

accomplish the objectives of criminal sentencing.  18 U.S.C. § 3553(a); *see United States*

v. *Cavera*, 550 F.3d at 188 ("In addition to taking into account the Guidelines range, the

district court must form its own view of 'the nature and circumstances of the offense and

the history and characteristics of the defendant.'") (*en banc*).

17

III.   **DISCUSSION**

A.    **The Applicable Guidelines Range**

The Government agrees with the Probation Office's analysis with respect to the applicable Guidelines' range for Moreno.  Specifically, the Government agrees that Counts One through Five are grouped pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 3D1.2(b).  (PSR ¶ 78).  The Government also agrees that Count Three is the most serious count, and that therefore the Guidelines' offense level before any victim-related adjustments is 51.  (PSR ¶¶ 87; 95-99).

The Government also agrees that pursuant to U.S.S.G. § 3A1.2(a) a three-level adjustment is appropriate based on the fact that Moreno participated in a conspiracy to sell arms to a terrorist organization with knowledge that the weapons would be used to specifically target American officers and employees.  (PSR ¶ 100).  Additionally, because the offense involved a "Federal crime of terrorism," as defined by 18 U.S.C. § 2332b(g)(5), the offense level should be increased by 12 levels.  (PSR ¶ 101).[2]

Based on the foregoing, Moreno's applicable Guidelines' offense level is 66.  Because the terrorism enhancement in U.S.S.G. § 3A1.4 applies, pursuant to

---

[2]        Under 18 U.S.C. § 2332b(g)(5), a "Federal crime of terrorism" is defined as an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  The evidence at trial clearly established that Moreno was made aware of the fact that the weapons he agreed to sell were going to the FARC to kill Americans, and pressed forward with the deal.  (Tr. 634; GX 39T at 43; GX 39T at 91).

U.S.S.G. § 3A1.4(b), Moreno's Criminal History Category is Category VI.  (PSR ¶112).[3]

Accordingly, based on a Guidelines offense level of 66, and a Criminal History Category

of VI, the Guidelines range applicable to Moreno is life imprisonment.  (PSR ¶ 148).

          Although the Government agrees with the Probation Office's Guidelines'

calculation, it respectfully disagrees with the Probation Office's sentencing

recommendation that the Court impose a non-Guidelines sentence at the absolute lowest

sentence available:  the 25-year mandatory minimum.  While the Government

acknowledges that Al Kassar played a more significant role in the offense than Moreno,

and that Moreno is relatively older than most defendants, the Government respectfully

submits that the imposition of a non-Guidelines sentence at the bare mandatory minimum

fails to account for the key role Moreno played in the terrorism crimes and underestimates

the severity of Moreno's offense.  Accordingly, for the reasons set forth below, the

Government respectfully submits that a sentence in excess of the 25-year mandatory

_____

          [3]     Although United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003),
authorizes the Court to entertain a downward departure where the 12-level terrorism
enhancement over-represents the seriousness of a defendant's criminal conduct or the
likelihood that a defendant will commit other crimes, this is simply not such a case.  (PSR
¶ 171; PSR at 36).  The evidence adduced at trial confirmed that Moreno played a key
role in Al Kassar's arms trafficking organization, an ongoing enterprise capable of arming
violent groups around the world.  The evidence also demonstrated Moreno's willingness
to participate in a conspiracy the objective of which was to place millions of dollars of
lethal weapons into the hands of a known terrorist organization, the FARC.  If the DEA
had not carried out the sting operation developed evidence against Al Kassar and Moreno,
there is every reason to believe that Moreno would have continued to assist Al Kassar in
his criminal ventures and have been willing to arm other terrorist groups in the future if
presented with the opportunity.

minimum, but less than the sentence the Court imposes on Al Kassar, fits Moreno's

crimes and is reasonable in light of the factors outlined in 18 U.S.C. § 3553(a).

**B.     The 18 U.S.C. § 3553(a) Factors And The Appropriate Sentence**

The history and characteristics of Moreno counsel for a sentence in excess

of the 25-year mandatory minimum.  Moreno, who lived in Al Kassar's palatial estate and

was intimately involved in Al Kassar's arms trafficking and money laundering crimes,

played a key role in the FARC weapons deal.  Moreno controlled information about Al

Kassar's bank accounts, and worked with Carlos to coordinate payments for the arms.

(Tr. 719).  Moreno attended meetings in the living room of Al Kassar's mansion during

which the details of the FARC weapons deal were discussed.  (Tr. 693).  As the deal

progressed, Moreno spoke repeatedly over the telephone and e-mail with Carlos about the

deal.  (GX 46T; GX 47T; GX 51T; GX 54T; GX 108).  Moreno traveled with Al Kassar

to Bulgaria and Romania in May 2007 to meet in person with representatives of the arms

factories who were supplying the weapons.  (GX 59T at 2; GX 60T at 1; GX 257).

Finally, Moreno himself flew to Bucharest, Romania, in June 2007 in an effort to collect

more than 3 million euros in payment for the weapons deal.  (Tr. 842; 1034).  With full

knowledge of the fact that the FARC was going to use the weapons to kill Americans in

Colombia, Moreno continued to play a vital role in the charged conspiracies until the

moment of his arrest in Bucharest on June 7, 2007.

In assessing the nature of the offense here, it is worth noting the breathtaking scope of the arms trafficking crimes in which Moreno was engaged. Moreno and his co-defendants agreed to supply more than 12,000 weapons, as well as SAMs, to the FARC, an organization he believed intended to use the arms to kill Americans.  The documents seized inside Al Kassar's estate demonstrated that Moreno and Al Kassar had access to arsenals of weapons through factories in Romania and Bulgaria, and that they were actively working to provide such weapons to the FARC. (GX 210).  In this case, Moreno agreed to provide weapons to arm essentially a terrorist army of nearly 20,000 soldiers (GX 39T at 95-98), and demonstrated every desire to consummate the deal and develop a working relationship with the violent Colombian group.  Moreno's willingness to assist in providing a massive quantity of lethal weapons to a terrorist group makes the nature of his offense unique, and merits a sentence in excess of the applicable 25-year mandatory minimum.

The fact that the DEA arrested Moreno as part of a sting operation, and that no Americans actually were killed as a result of his terrorism crimes, is not in any way a mitigating factor.  The jury convicted Moreno of four terrorism conspiracies, each of which Congress has determined should be subject to the same maximum sentences and advisory Guidelines ranges as their substantive counterparts.  Here, Moreno and his co-defendants demonstrated both the capacity and the willingness to put millions of dollars worth of high-powered, lethal weapons into the hands of men he believed were terrorists

plotting to kill Americans.  In calling for similar punishment for conspiracies to commit

terrorism crimes as for substantive terrorism crimes, Congress implicitly recognized that

U.S. law enforcement should not have to wait until crimes of terrorism are actually

committed before targeting, investigating, and arresting criminals engaged in such

conduct.  Transnational criminals like Moreno who are ready, willing, and able to arm

terrorists transform their customers from intolerant ideologues into lethal criminals who

pose the gravest risk to civilized societies.  The fact that the DEA identified the threat that

Al Kassar and, in turn, Moreno posed and developed overwhelming proof of their

criminal intent through a long-term, sting operation before they had the chance to actually

arm the FARC and kill Americans should be applauded, not be cited as a factor that

somehow mitigates Moreno's sentence.

## IV.    CONCLUSION

Based on the foregoing, the Government respectfully submits that a

sentence in excess of the applicable 25-year mandatory minimum, but less than the

sentence the Court imposes on Al Kassar, is sufficient but not greater than necessary to

comply with the purposes of sentencing outlined in 18 U.S.C. § 3553(a).

Dated:          February 23, 2009

                                  Respectfully submitted,
                                  MICHAEL J. GARCIA
                                  United States Attorney

                                  s/ Boyd M. Johnson III

By:     _____
                                  BOYD M. JOHNSON III
                                  BRENDAN R. MCGUIRE
                                  Assistant United States Attorneys
                                  (212) 637-2276/2220

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on the following by ECF and electronic mail on February 23, 2009:

Roger L. Stavis, Esq.
Gallet Dreyer & Berkey, LLP
845 Third Avenue, 8th Floor
New York, New York 10022
(212) 935-3131
rls@gdblaw.com

s/ Boyd M. Johnson III
_____
Boyd M. Johnson III

24